**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
Orlando Division

| | |
|---|---|
| TRAVEL + LEISURE RESORT DEVELOPMENT, INC. f/k/a WYNDHAM VACATION OWNERSHIP, INC. a Delaware corporation; WYNDHAM VACATION RESORTS, INC., a Delaware corporation; WYNDHAM RESORT DEVELOPMENT CORPORATION; an Oregon Corporation, | Case No.: |
| Plaintiffs, | |
| v. | |
| LINX LEGAL, INC., a Wyoming corporation; and ROSARIO CRAIG MUSUMECI, an individual and resident of the State of Florida, | |
| Defendants. | |

## **COMPLAINT**

Plaintiffs Travel + Leisure Resort Development, Inc. f/k/a Wyndham Vacation Ownership, Inc. ("WVO"); Wyndham Vacation Resorts, Inc. ("WVR"); and Wyndham Resort Development Corporation ("WRDC") (WVO, WVR and WRDC, collectively, "Wyndham"), through counsel and pursuant to the applicable Federal Rules of Civil Procedure, hereby sue Linx Legal, Inc., a Wyoming corporation ("Linx") and Rosario Craig Musumeci, individually ("Musumeci"), (Linx and Musumeci, together, the "Linx Defendants"), and state as follows:

## I.    INTRODUCTION

1.    The Linx Defendants operate an unlawful timeshare exit business that promises illusory services to consumers while making false promises of success.

2.    Linx represents to consumers that it has a legal means to reduce or eliminate legal obligations that consumers owe to timeshare developers.

3.    In doing so, Linx falsely claims a near-perfect success-rate.

4.    Linx deceives consumers into paying for services that the exit company cannot or does not provide.

5.    Linx has no actual service of its own and no means to deliver its advertised services—much less guarantee such services.

6.    In order to provide the purported services it advertises, Linx directs consumers to cease payment owed to Wyndham and uses Wyndham's services.

7.    Linx presents the Wyndham services as if they were Linx's own services.

8.    In the course of such deception, and through its communications with consumers, Linx interferes with the relationship between Wyndham and Wyndham's customers.

9.    Both Wyndham and consumers are harmed by Linx's practices.

## II.    PARTIES, JURISDICTION, AND VENUE

### A.    <u>The Plaintiffs</u>

10.    WVO is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

11.    WVR is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

12.    WRDC is a corporation organized and existing under the laws of the State of Oregon with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

### B.    <u>The Defendants</u>

13.    Linx is a corporation organized and existing under the laws of the State of Wyoming with a principal address at 2120 Crown Centre Dr., Suite 100, Charlotte, NC 28227.

14.    Linx was originally incorporated in 2009 under the name Flower Creations, Inc.

15.    In March 2017, Linx changed its name from Flower Creations, Inc. to American Financial Debt Relief, Inc.

16.    In April 2017, Linx changed its name from American Financial Debt Relief, Inc. to Linx Legal Inc.

17.    Linx maintains offices in Clermont, Florida and Myrtle Beach, South Carolina.

18.    Linx represents that its Clermont, Florida office is its "Orlando Office".

19.    Musumeci, a former Vice President of Sales at Wyndham, is an individual and citizen of the State of Florida.

20.    Musumeci is the President of Linx.

21.    Musumeci is personally responsible for, and individually directs and controls, all of Linx's business operations including, but not limited to, its advertising and sales practices, as discussed herein, along with all means by which Linx purports to provide the advertised services. Musumeci personally controls all aspects of the Linx business in every significant way.

22.    Musumeci is not a licensed attorney and is not admitted to practice law in any jurisdiction.

23.    Linx is not a law firm.

**C.    Subject Matter Jurisdiction**

24.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it asserts a federal question under the Lanham Act.

25.    This Court has subject matter jurisdiction over state law claims brought herein pursuant to 28 U.S.C. § 1367 as the Court has supplemental jurisdiction over such claims as they are so related to the Lanham Act causes of action that they form

part of the same case or controversy under Article III of the United States Constitution.

**D.    <u>Personal Jurisdiction</u>**

26.    This Court has personal jurisdiction over the Linx Defendants for the following reasons:

 a. Musumeci is an individual and citizen of the State of Florida;

 b. Linx maintains an office in Clermont, Florida.

 c. Linx Defendants' actions, as more fully described herein, are directed at consumers across the country, including consumers in the State of Florida.

 d. Linx Defendants operate websites that are freely accessible from Florida and target consumers in the State of Florida, which involves, *inter alia*, the repeated transmission of files over the Internet in, to, and out of the State of Florida;

 e. Certain timeshare owners targeted by the Linx Defendants that have timeshare contracts with Wyndham are Florida residents.

 f. Linx Defendants committed acts that caused injury to Wyndham's businesses whose principal place of business is in Orlando, Florida; and

 g. Linx Defendants engaged in substantial and not isolated activity in the State of Florida.

E.    **Venue**

27.    Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Wyndham's claims occurred in this district and Linx maintains office space in the Middle District of Florida. Moreover, Florida has a general policy interest in protecting residents harmed by violations of Florida law by in-state actors such as the Linx Defendants.

F.    **Conditions Precedent**

28.    All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

III.    **ALLEGATIONS OF FACT**

A.    **The Wyndham Entities**

29.    Wyndham is a global leader in the hospitality and vacation ownership industry with properties and a network spanning the world.

30.    WVO is the parent company or ultimate parent company of entities that conduct timeshare sales and development activities throughout the United States, such as WVR and WRDC.

31.    As part of its business, Wyndham enters into written agreements (the "Purchase Agreements") with consumers who purchase timeshare interests from Wyndham ("Wyndham Owners").

32.     Pursuant to the Purchase Agreements, Wyndham Owners agree to pay an amount certain for the timeshare interest and agree to pay annual maintenance fees for the duration of the ownership. Annual maintenance fees are used for repair and maintenance of resorts in the Wyndham Owner's timeshare plan, as well as other expenses including taxes and insurance for the resorts.

33.     If a Wyndham Owner obtains financing for purchase of the timeshare interest, the Wyndham Owner may also execute a promissory note (the "Note") (the Purchase Agreements and Notes, if applicable, are referred to herein as the "Timeshare Contracts").

34.     The Timeshare Contracts control the benefits and obligations of vacation ownership and the relationship between Wyndham and the Wyndham Owners, including, but not limited to, payment obligations.

35.     The Timeshare Contracts are legal documents.

36.     Wyndham has established multiple internal programs that provide Wyndham Owners with a service of ending, canceling, and/or otherwise amending the legal obligations in the Timeshare Contracts (the "Internal Programs").

37.     Wyndham developed, implemented, maintains and directly operates the Internal Programs using its own employees.

38.     The Internal Programs can only be implemented by the Wyndham employees responsible for such programs.

39.    Legal obligations owed by Wyndham Owners to Wyndham pursuant to the Timeshare Contracts, inclusive of payment obligations, can only be amended through (a) voluntary agreement of all parties, or (b) judicial order.

**B.    Defendants' Advertising Process**

40.    Linx advertises its services through a variety of ways including both verbal and non-verbal mediums.

41.    Musumeci created and, individually, directs and controls Linx and is the mastermind of Linx's advertising practices.

42.    Musumeci oversees Linx employees in the execution of Linx's advertising practices.

43.    As to the non-verbal advertising, Linx engages in at least the following (the "Non-Verbal Advertising Practices"):

a.    A website maintained by Linx with the URL of https://linxlegal.com/;

b.    Social-media website profiles; and/or

c.    Other digital and online advertising.

44.    The Non-Verbal Advertising Practices direct consumers to call Linx by telephone or to fill out and submit a web-based form to Linx.

45.    Linx engages in outbound telephonic solicitation of timeshare owners using land records to identify consumers owning timeshare interests (the "Cold Calls").

46.    Linx also engages third-parties to solicit consumers and then transfer to Linx live telephone calls with consumers ("Live Transfer").

47.    After a consumer contacts Linx or Linx reaches out to a consumer through the Cold Calls, Linx engages in the following verbal advertising (the "Verbal Sales Presentations"):

      a.    Telephonic sales presentations; and/or

      b.    In-person sales presentations.

48.    After receipt of a Live Transfer, Linx will then engage in one of the Verbal Sales Presentations.

49.    Upon information and belief, the Non-Verbal Advertising Practices, Cold Calls, and Live Transfers funnel consumers to the Verbal Sales Presentations.

50.    The Verbal Sales Presentations, the apex of a multi-layered advertising campaign, are an integral part of Linx's advertising campaign and are widely disseminated to prospective Linx customers including the Wyndham Owners.

51.    Consumers do not execute any written agreement for Linx's services until after exposure to the Verbal Sales Presentations.

52.    The Non-Verbal Advertising Practices, Live Transfers, Cold Calls, and Verbal Sales Presentations together form an organized sales campaign (the "Advertising Practices").

53.    Linx's Advertising Practices target timeshare-owning consumers in multiple states across the United States of America.

54.     Linx's Advertising Practices constitute commercial speech as they (a) propose a commercial transaction between Linx and consumers, (b) contain reference to a specific service (the purported timeshare exit services), and (c) Linx has an economic motivation for distributing the advertising so as to garner payment from consumers.

### C.     Defendants' Advertising Content

55.     Linx holds itself out as a "Leading Timeshare Cancellation Company" and the "Top Timeshare Exit Company."

56.     Linx's Advertising Practices target Wyndham Owners. An example of how Linx targets Wyndham Owners is the following:



57.     Linx's Advertising Practices target timeshare-owning consumers who own timeshares through contracts with timeshare developers other than Wyndham.

58.     Linx's Advertising Practices are substantially the same as to Wyndham Owners and timeshare-owning consumers who own timeshares through contracts with timeshare developers other than Wyndham.

59.     Linx's Advertising Practices do not always distinguish between Wyndham and other timeshare developers.

60.     Linx represents that it has "vast experience with most every resort."

61.     Linx engages in substantial false and/or misleading advertising through the Advertising Practices and other means.

62.     Within the Advertising Practices, Linx represents and/or suggests that it will provide customers with a legal service, including without limitation, through use of the following statements (the "Legal Services Statements"):

    a.     Phrases common to the practice of law;

    b.     Statements that Linx will engage in work so as to alter contractual obligations owed to timeshare developers;

    c.     Inclusion of "Legal" in Linx's name;

    d.     Reference to specific state laws;

    e.     Reference to third-party websites providing legal advice;

    f.     Reference to analysis of "contract terms";

    g.     Reference to "legally exiting" timeshare obligations;

    h.     Reference to a "rescission window" or "rescission period";

i.      Advice on how to terminate legal obligations during a "rescission period";

j.      Reference to use of "Case Analysts", "Case Managers", and "Case Builders";

k.      Reference to a "consultation";

l.      Reverence to "clients";

m.      Reference to "negotiations";

n.      Characterization of Linx as an "advocate";

o.      Claim that Linx will "fight for your rights to get out of your timeshare contract"; and

p.      Representation that Linx will advise Wyndham Owners on what content to include in legal demand letters.

63.    Within the Advertising Practices, Linx makes a number of other statements (the "Additional Statements") which include amongst others, the following:

a.      Linx represents that it has been a timeshare exit company since 2009;

b.      Linx promises that it can obtain refunds for Wyndham owners;

c.      Linx makes statements that owners can and should cease payment obligations to Wyndham;

       d.     Linx states that it would use its own resources to achieve a termination of timeshare obligations; and

       e.     Linx represents a false success rate to prospective customers.

64.    The Legal Services Statements and the Additional Statements are false and/or misleading.

65.    Linx's Advertising Practices create the false impression (a) that Linx provides legal services, (b) that Linx has developed its own service for purposes of canceling Wyndham Timeshare Contracts, and (c) that Wyndham Owners can stop making payments to Wyndham with little to no risk of any negative impact to their credit.

66.    The service that Linx advertises is one to reduce or eliminate the debt consumers owe to timeshare developers.

67.    Linx's Advertising Practices misrepresent inherent and material characteristics of its service.

68.    Linx's Advertising Practices misleadingly and falsely advertise the same outcome as provided by certain of Wyndham's Internal Programs.

69.    The Advertising Practices described in Paragraphs 40 through 68 are hereinafter collectively referred to as the "False and/or Misleading Advertisements".

70.    Musumeci actively, knowingly, and individually directs Linx's False and/or Misleading Advertisements, as well as the false, misleading, and deceptive statements made to Wyndham Owners by Linx employees. Musumeci directs,

controls, ratifies, authorizes, personally participates in and/or is the moving force behind the False and/or Misleading Advertisements.

71.    Musumeci is personally responsible for developing the content of Linx's False and/or Misleading Advertisements.

### D.    Defendants' Agreements

72.    Based on Linx's False and/or Misleading Advertisements, Linx enters into agreements with Wyndham Owners for the purpose of reducing or eliminating debt owed to Wyndham pursuant to the Timeshare Contracts.

73.    The service fee that Linx charges to Wyndham Owners does not reflect the amount of work that Linx will perform for its customers.

### E.    Linx Defendants Do Not Provide the Advertised Service

74.    Linx Defendants do not offer the service described in the False and/or Misleading Advertisements as:

   a.    Linx cannot provide any legal services because it is not a law firm;

   b.    Musumeci cannot provide any legal services because he is not a lawyer;

   c.    Nothing Linx Defendants do is capable of altering legal obligations between Wyndham and Wyndham Owners.;

   d.    Nothing Linx Defendants do is capable of altering legal obligations enumerated in the Timeshare Contracts; and/or

   e.    Linx Defendants do not stop harm to a consumer's credit.

- 14 -

75.     Indeed, Linx does not actually provide any services itself.

76.     Linx's efforts to deliver the advertised services are substantially limited to (a) engaging in the practice known as "ghost writing" where Linx drafts letters (the "Ghost Letters") for Wyndham Owners to send to Wyndham or governmental regulators as if the letters were drafted by such Wyndham Owners, (b) instructing Wyndham Owners to cease payment of monetary obligations such Wyndham Owners owe to Wyndham pursuant to the Timeshare Contracts; (c) feigning an ability to protect consumer credit, and (d) instructing Wyndham Owners to hide the Wyndham Owner's relationship with Linx from Wyndham.

77.     The Ghost Letters demand certain legal relief.

78.     The Ghost Letters are not legally capable of altering legal obligations between Wyndham and Wyndham Owners.

79.     Ceasing payment to Wyndham does not relieve Wyndham Owners of monetary obligations under the Timeshare Contracts.

80.     Any reduction or cancellation of debt provided to Wyndham Owners is provided by Wyndham itself through its Internal Programs rather than any service that Linx itself developed and/or performed.

81.     Linx Defendants represent that Linx, rather than Wyndham, provides services actually rendered through Wyndham's own Internal Programs.

F.    **Interference with Customer Relationships**

82.    Linx's practices described above separate Wyndham from the Wyndham Owners who are the parties to the Timeshare Contracts, and in privity with each other.

83.    During the course of their interaction with Wyndham Owners, either through advertising, or after Wyndham Owners sign up for Linx's services, Linx convinces Wyndham Owners to cease payments owed to Wyndham pursuant to the Timeshare Contracts.

84.    Linx provides Wyndham Owners with "guidance" on how to cease payment to Wyndham.

85.    During the course of their interaction with Wyndham Owners, either through advertising, or after Wyndham Owners sign up for Linx's services, Linx directs Wyndham Owners to hide such owners' relationship with Linx.

86.    The goal of Linx's purported services is to reduce (potentially to zero) the financial obligation that consumers owe to Wyndham.

87.    Wyndham Owners cease making payments owed to Wyndham pursuant to the Wyndham Owners' obligations to Wyndham because of Linx's instructions.

88.    As a result of the Wyndham Owners ceasing payment to Wyndham, Wyndham suffers damages and Wyndham Owners suffer injury including, but not limited to, the inability to utilize the benefits of their timeshare ownership and a decrease in their credit score.

**COUNT I**

**Reverse Passing Off in Violation of the Lanham Act**
**(Against all Linx Defendants)**

89.    Wyndham adopts and realleges paragraphs 1 through 88 above as if fully set forth herein.

90.    This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a).

91.    Linx misrepresents Wyndham's services as its own.

92.    Wyndham originated the Internal Programs as it:

    a.    Developed the Internal Programs itself; and

    b.    Operates the Internal Programs through its own employees.

93.    Linx Defendants falsely designated Linx as the source of origin of the Internal Programs by:

    a.    Falsely advertising a service that it only provides through co-opting the Internal Programs through the Ghost Letters; and

    b.    Purporting to provide a service to its customers that Wyndham actually provides.

94.    Linx Defendants intended to pass off Wyndham's services as their own as Linx expressly claims to offer debt reduction and/or elimination services and causes consumers to believe that Linx will use its own resources to achieve such reduction or elimination.

95.    Linx Defendants' advertising and sale of a service purporting to offer debt reduction or elimination constitutes use of a false designation of origin that is

likely to cause confusion among prospective purchasers including, but not limited to, confusion that the advertised service of debt reduction or elimination associated with Timeshare Contracts is that of Linx rather than Wyndham.

96.     Additionally, Linx's use of the Internal Programs to deliver services advertised to Wyndham Owners is likely to confuse Wyndham Owners as to who operates the Internal Programs and/or options available to Wyndham Owners to reduce or eliminate debt obligations.

97.     Wyndham has been harmed by the Defendants' false designation of the origin of the Internal Programs, at least, because (a) Wyndham's consumer relationships are thwarted and Wyndham is denied a dialogue with its consumer base, (b) Wyndham is denied the ability to carry out the Internal Programs in the manner in which Wyndham has designed and typically operates such services, and (c) Wyndham Owners cease payment to Wyndham as owed pursuant to the Timeshare Contracts.

98.     Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) Defendants' profits resulting from their false advertising to Wyndham Owners, (ii) attorneys fees as this is an exceptional case under 15 U.S.C. § 1117(a), and (iii) the costs of the action.

99.     Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

## COUNT II

### <u>False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)</u>
### (Against all Linx Defendants)

100.   Wyndham adopts and realleges paragraphs 1 through 88 above as if fully set forth herein.

101.   This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

102.   Linx Defendants, through the False and/or Misleading Advertisements, willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers. The False and/or Misleading Advertisements incorporated herein were literally false, either on their face or by necessary implication, as set forth herein, or were materially misleading.

103.   The False and/or Misleading Advertisements caused consumers to falsely believe that the Linx Defendants offer a legitimate product or service.

104.   The False and/or Misleading Advertisements were conveyed, among other ways, verbally in sales presentations conducted by Linx Defendants as part of an overall advertising and marketing plan.

105.   Linx Defendants' False and/or Misleading Advertisements were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for the Linx Defendants' own financial gain, for the purpose of influencing consumers to retain the Linx Defendants'

services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

106.   Musumeci is personally and individually liable for the actions of Linx as he is the architect of the overall scheme, directs the activities of Linx, and has control over Linx.

107.   Linx Defendants' False and/or Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of the consuming public.

108.   Linx Defendants' deception is material in that it is likely to influence the consumers' decisions whether to retain Linx Defendants' services, or to cease making payments to Wyndham or utilize programs provided by Wyndham, which are available to assist Wyndham Owners who may wish to legitimately terminate their timeshare ownership with Wyndham.

109.   Linx Defendants' False and/or Misleading Advertisements materially misrepresent their services and what they do for consumer which is designed to trick Wyndham Owners into retaining the Linx Defendants, thereby diverting payments from Wyndham to the Linx Defendants.

110.   Linx Defendants further deceive the consuming public by knowingly concealing the existence of the Internal Programs and concealing the legitimate options available to Wyndham Owners.

111.    The Linx Defendants' False and/or Misleading Advertisements causes Wyndham Owners to believe that Wyndham will not help them exit their timeshares (when Wyndham has the Internal Programs) and that the only solution is to use the Linx Defendants' competing "service", even though that service is false and illusory.

112.    The Linx Defendants' False and/or Misleading Advertisements cause consumers to utilize the Linx Defendants' false exit services, which directly results in the Wyndham Owners ceasing payment on their Timeshare Contracts at the Linx Defendants' instruction.

113.    Without the Linx Defendants' False and/or Misleading Advertisements, the Wyndham Owners would have continued to make payments on their Timeshare Contracts.

114.    Linx Defendants' advertised services affect interstate commerce.

115.    Linx Defendants are operating as competitors to Wyndham. Once a Wyndham Owner enters into an agreement with the Defendants, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Linx Defendants.

116.    As a result of the Linx Defendants' False and/or Misleading Advertisements, Wyndham suffered and continues to suffer injury,

117.    As a result of the Linx Defendants' False and/or Misleading Advertisements, Wyndham suffered injury in that timeshare owners ceased payment to Wyndham because of the advertising.

118.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) Defendants' profits resulting from their false advertising to Wyndham Owners, (ii) attorneys fees as this is an exceptional case under 15 U.S.C. § 1117(a), and (iii) the costs of the action.

119.    Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

**COUNT III**

**<u>Tortious Interference</u>**
**(Against all Linx Defendants)**

120.    Wyndham adopts and realleges paragraphs 1 through 88 above as if fully set forth herein.

121.    This is a cause of action for tortious interference with contractual and/or business relations.

122.    Wyndham has business and contractual relationships with the Wyndham Owners as documented in the Timeshare Contracts.

123.    Linx Defendants have actual, constructive, and/or specific knowledge of the business and contractual relationships between Wyndham and the Wyndham Owners. The very fact that Wyndham has such relationship with the Wyndham

- 22 -

Owners is the basis upon which Linx Defendants themselves sought to establish a relationship with the Wyndham Owners. Indeed, if it were not for the existence of the business and contractual relationships between Wyndham and the Wyndham Owners, Linx would have no reason to exist. The service that Linx Defendants purport to offer is conditioned on the existence of a business or contract between Wyndham and Wyndham Owners in the first instance.

124.   Linx Defendants have successfully solicited Wyndham Owners and caused or induced them to breach and/or terminate their contractual relationships with Wyndham.

125.   In particular, Linx Defendants have intentionally interfered with the business relationships between Wyndham and the Wyndham Owners and procured the breach of Wyndham's contractual relationships by, at least, soliciting Wyndham Owners and persuading them to breach obligations owed pursuant to the Timeshare Contracts.

126.   If Wyndham Owners knew the truth about Linx Defendants' illusory services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to Linx Defendants nor breach the Timeshare Contracts.

127.   Linx Defendants have utilized improper and/or illegal means to interfere with Plaintiffs' business and contractual relations.

128.   Linx Defendants' actions were done with improper motive and not in good faith, but rather were done with the knowledge and predominant purpose to

injure Wyndham or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Linx Defendants' actions and without reasonable grounds for Linx Defendants to believe that their actions were justified and proper.

129.    As a direct and proximate result of Linx Defendants' intentional misconduct, Wyndham Owners have terminated their relationships with Wyndham in that they have, at least, terminated, or have baselessly sought to terminate via Linx Defendants, their contractual relationships with Wyndham before the expiration of the terms of those contracts. These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

130.    Linx Defendants have no economic interest in the relationships between Wyndham and the Wyndham Owners or in the Timeshare Contracts.

131.    Linx Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as Defendants are strangers to the contractual relationships between Wyndham and its Wyndham Owners, and their interference with Wyndham's business is willful and malicious.

132.    The Linx Defendants are not law firms and have no attorney-client relationships with Wyndham Owners; therefore, they are not privileged to interfere under the attorney-client privilege.

133.   The Linx Defendants are not agents of the Wyndham Owners because the Wyndham Owners do not control their actions. Rather, the Linx Defendants control and guide the "exit" strategy as a so-called "service" that they provide to the Wyndham Owners.

134.   Further, the Linx Defendants are motivated by personal gain and not by the interests of the Wyndham Owners.

135.   Therefore, the Linx Defendants are not privileged to interfere as an agent of the Wyndham Owners.

136.   As a direct and proximate result of the foregoing, Wyndham suffered injury in the form of unpaid loan balances and other costs related to the recovery of delinquent timeshare interests.

137.   Defendants' ongoing conduct has caused, and if not permanently enjoined, will continue to cause, irreparable harm to Wyndham due to the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law to fully remedy the harm caused by Defendants to Wyndham.

138.   Plaintiffs are entitled to injunctive relief upon such terms as the Court may deem reasonable, to prevent further misconduct by Defendants.

## COUNT IV

### Violation of Florida's Deceptive and Unfair Trade Practices Act
**(Against all Linx Defendants)**

139.   Wyndham adopts and realleges paragraphs 1 through 88 above as if fully set forth herein.

140.    This is a cause of action for permanent injunctive relief under Florida Statutes § 501.201 *et. seq.*

141.    This cause of action is separate and apart from the causes of action premised upon Defendants' Lanham Act violations. It is based on Linx Defendants' business practices as a whole, which are deceptive and unfair.

142.    Wyndham is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

143.    Wyndham's owners and prospective owners are consumers for purposes of FDUTPA.

144.    Linx Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

145.    Linx Defendants are engaged in certain deceptive and unfair practices in that they:

       a.    Engaged in unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in the conduct of a trade or commerce (the "Traditional Unfair and Deceptive Acts"); and

       b.    Violated a law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices (the "*Per Se* Deceptive Acts").

146.    The Traditional Unfair and Deceptive Acts include, as set forth above: (1) luring Wyndham Owners into procuring Linx Defendants' illusory services with false advertising;(2) luring Wyndham Owners into procuring Linx Defendants' illusory services under the false pretense that Linx Defendants provide a service of their own when, in fact, they merely co-opt Wyndham's Internal Programs; (3) use of misrepresentations to convince Wyndham Owners to pay substantial fees to "exit" their Timeshare Contracts with Wyndham, when, in many instances, a lawful termination is only available to consumers directly from Wyndham at no expense to the consumer, a party to the Timeshare Contracts, through the Internal Programs, (4) offering "guarantees" to Wyndham Owners about their "exits," even though Linx Defendants know that any such exits rely on Wyndham's assent and are thus never guaranteed; (5) supporting the illusory nature of their services by charging customers based on the outstanding debt owed to Wyndham rather than the cost of work necessary to perform the fictitious services; (6) failing to disclose to and/or concealing from the Wyndham Owners that Linx Defendants' "exit" "services" often includes a default and foreclosure, and subsequent negative credit impacts; (7) misleading consumers to believe that Linx Defendants could protect consumer credit scores should consumers cease paying obligations owed to Wyndham; (8) encouraging Wyndham Owners to deceive Wyndham by requiring such owners to hide their relationship with Linx Defendants, and (9) falsely representing a higher "success" rate than is accurate.

147. The Traditional Unfair and Deceptive Acts:

     a.     Are likely to deceive a consumer acting reasonably in the same circumstances, and

     b.     Offend public policy and are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.

148. The *Per Se* Deceptive Acts include violation of state law prohibitions against non-lawyers providing legal services ("UPL Statutes") such as, but not necessarily limited to, Fla. Stat. § 454.23 and FL ST BAR Rule 10-1.1, *et. seq*.; as Linx Defendants engage in the unlicensed and/or unauthorized practice of law. Specifically, Linx Defendants engage in the unlicensed and/or unauthorized practice of law by (a) representing through the Legal Services Statements that Linx will provide legal services to consumers, (b) advising Wyndham Owners on various legal remedies, and (c) preparing the Ghost Letters on behalf of the Wyndham Owners. Yet, Linx Defendants are not authorized to engage in such conduct as they are not licensed to practice law in any jurisdiction.

149. The Supreme Court of Florida has determined that conduct enumerated in Paragraph 148 constitutes the unauthorized practice of law.

150. The UPL Statutes prohibiting the unauthorized practice of law such as Fla. Stat. § 454.23 and FL ST BAR Rule 10-1.1, *et. seq*. exist for the purpose of proscribing conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

151.   The conduct described in paragraphs 145 through 150 is hereinafter collectively referred to as the "Deceptive and Unfair Acts".

152.   The Deceptive and Unfair Acts are likely to mislead reasonably-acting Wyndham Owners to their detriment.

153.   Section 501.211(1) "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012).

154.   Under § 501.211(1), "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than the actual damage remedy under § 510.211(2). *Id.*; *see also Kinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1480 (S.D. Fla. 1990).

155.   Linx Defendants' actions, including the Deceptive and Unfair Acts, have aggrieved and caused injury to Wyndham in that Wyndham failed to receive outstanding loan payments it was entitled to receive from Wyndham Owners; suffered costs associated with past due collection efforts and foreclosure proceedings; incurred maintenance fees on recovered inventory; incurred marketing costs for re-sale of recovered inventory; and lost opportunity to reengage with Wyndham Owners so as to resolve issues without the taint of Linx Defendants' interference. *See* Fla. Stat. § 501.204(1).

156.   The Deceptive and Unfair Acts in violation of FDUTPA aggrieved Wyndham and Wyndham is entitled to injunctive relief. See Fla. Stat. § 501.204(1).

157.   Wyndham's losses will increase unless Linx Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

158.   Wyndham is entitled to recover its attorney's fees and costs from Linx Defendants under Florida Statutes §§ 501.2105 and 501.211.

## PRAYER FOR RELIEF

Wyndham respectfully request the Court enter final judgment in their favor and against Linx Defendants, jointly and severally, for:

a.    Corrective advertising;

b.    Disgorgement of Linx Defendants' profits;

c.    Together with interest thereon;

d.    An award of court costs;

e.    A determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees under the Lanham Act;

f.    An award of attorney's fees under FDUTPA;

g.    Entry of permanent injunctive relief against Defendants, as well as their agents, representatives, employees, and affiliates, prohibiting Defendants from publishing or contributing to any false and misleading statements in advertising; engaging in any deceptive and/or unfair conduct; and engaging in any other improper acts described herein; and

h.    For such other and further relief as the Court deems appropriate.

Respectfully Submitted,

/s/ Alfred J. Bennington, Jr.
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**BENJAMIN F. ELLIOTT, ESQ.**
Florida Bar No. 1010706
belliott@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

*Attorneys for Plaintiffs*

Dated:  April 9, 2025

ORLDOCS 22125345 9